UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**GARRICK RICHARDSON,**<br><br>Defendant. | Case No. 23-cr-000200 |

### GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION

On a Saturday night in May 2023, dozens of individuals were headed home from a popular and crowded nightclub after an evening of drinking and dancing. Then, in a garage next door, Mr. Richardson and his co-defendants escalated what was a shoving match into a shooting when he chased a vehicle around a parking garage while carrying a loaded handgun. This was no act of self-defense. After Mr. Richardson and others attempted to corner the vehicle, an individual with Mr. Richardson opened fire on the vehicle. This is at least the third time Mr. Richardson has been charged with the illegal possession of a firearm over the last five years. Indeed, he was on supervised release for a firearms conviction at the time he possessed this firearm. And now Mr. Richardson has graduated from mere possession to using these deadly weapons to strike fear in others. For the following reasons, the Government requests a sentence of fifty-one months' incarceration followed by three years' supervised release.

### BACKGROUND

On May 13, 2023, just after 3:00 AM, a large group of individuals was outside the Abigail nightclub at 1730 M Street NW. At 3:09 AM, a group of five or six men got into a physical altercation in the parking garage next to the nightclub. The fight quickly broke up, with two of the men entering a silver Kia, and the rest briefly exiting the parking garage towards M Street.

*Figure 1 – Individuals Entering Silver Kia*



As the silver Kia attempted to leave the parking garage, the men who had briefly left the parking garage returned with a much larger group of men and swarmed around the Kia. Mr. Richardson, who was wearing a black t-shirt with white lettering, dark jeans, white shoes, and has a lean build and closely trimmed hair, was one of these men.

*Figure 2 - Richardson and Others Running at Silver Kia*



The men surrounded the Kia in what appeared to be an attempt to stop it from leaving. As Mr. Richardson ran toward the driver side of the vehicle, another man pulled at the vehicle's door and then punched the window.

*Figure 3 - Richardson and Others Accosting Silver Kia*



The Kia tried to pull forward, but Mr. Richardson and the other men continued to pursue it. As Mr. Richardson ran after the Kia, he was holding what appeared to be a black handgun with an

3

extended magazine in his right hand.

*Figures 4, 5, and 6 – Richardson with Black Handgun*







The silver Kia then began reversing out of the garage. As it did, Mr. Dirk Easton, who was with Mr. Richardson, pointed a different black handgun with an extended magazine and ran forward at the vehicle, firing multiple times directly at its front windshield.

*Figures 7, 8, 9 – Richardson (Yellow) Watching as Easton (Red) Shoots at Vehicle*





After firing several shots, Easton was struck in the eye and fell to the ground, dropping his firearm. Law enforcement recovered this firearm from under a vehicle where it was observed on surveillance video being kicked.

6

*Figure 10 – Easton dropping the firearm*



As Mr. Easton was firing at the silver Kia, Mr. Richardson ran back toward the garage entrance and huddled with the other men.  As he did, a firearm still appears visible in his right hand.

*Figure 11 – Mr. Richardson crouching with handgun*



Law enforcement has collected multiple different angles of surveillance video reflecting these events.  In none of these videos, can anyone in the silver Kia be seen holding a weapon out of the vehicle, and in none of them can anyone be seen shooting out through the windshield of the vehicle.

7

Nor was broken glass or windshield fragments recovered from the garage consistent with an individual in the Kia firing outward. At no point in any of the recovered surveillance video does Mr. Richardson appear to be in any danger from the occupants of the silver Kia. And the tint of the Kia appears to be too dark for anyone on the outside to clearly see inside.

Mr. Richardson and others accompanied Mr. Easton to the hospital in a black BMW. Mr. Richardson was subsequently stopped outside the hospital and the black BMW was located. Inside the vehicle, officers recovered a black Glock 35 .40 caliber handgun with serial number ADKH277.

*Figure 12 – Firearm in Vehicle*



The firearm had one round in the chamber and twenty-one rounds of ammunition in a twenty-nine round capacity magazine. Additionally, the firearm was equipped with an apparent machinegun conversion device, commonly referred to as a "Glock switch" or "giggle switch," which renders a semi-automatic weapon fully automatic.

*Figure 17 – Recovered Firearm*



A WALES/NCIC query revealed that the firearm was reported stolen by the Raleigh North Carolina Police Department on April 22, 2023. Subsequent DNA analysis connected Mr. Richardson to the recovered firearm and magazine.

In sum, following an altercation outside of a club, Mr. Richardson accosted a vehicle armed with a black handgun and extended magazine as the vehicle tried to escape. An individual with Mr. Richardson then fired multiple rounds at this vehicle as it reversed, injuring himself in the process. Mr. Richardson and others escorted this man to GWU Hospital, with Mr. Richardson riding in the back of a black BMW. Officers then recovered a black handgun and extended magazine from the back of that black BMW. That gun was tested for DNA and confirmed Mr. Richardson's unlawful possession of it.

**<u>The Pre-Sentence Investigation Report</u>**

The Pre-Sentence Investigation Report (PSIR) in this matter summarizes Mr. Richardson's

personal and criminal history. Mr. Richardson is 30 and was born and raised in Washington, D.C. PSIR at ¶¶ 62-67. Mr. Richardson was primarily raised by his mother as his father was incarcerated for a significant portion of his childhood. PSIR at ¶ 64. Mr. Richardson reported that he grew up in high-crime areas where he witnessed violence and drug use. *Id.* Mr. Richardson completed up to the 9th grade but struggled in school. PSIR at ¶ 85. He has participated in job training and vocational programs. PSIR at ¶¶ 86-87. Mr. Richardson has reported some prior employment such as at Dollar Tree and Six Flags, as well as receiving work through the Pathways and Project Empowerment programs. PSIR at ¶¶ 89-92.

Mr. Richardson is in a committed relationship and has two children. PSIR at ¶ 65. Mr. Richardson reported that he suffers from anxiety. PSIR at ¶ 75. Mr. Richardson suffers from substance abuse issues, particularly abusing prescription opioids, cocaine, and other drugs. PSIR at ¶¶ 77-84.

Mr. Richardson has three prior convictions.

On January 23, 2018, officers were patrolling the 2200 block of Alabama Avenue SE when they encountered Mr. Richardson and a group of men. PSIR at ¶¶ 44. Mr. Richardson broke into a sprint upon the officers' approach. *Id.* Mr. Richardson was stopped and a patdown revealed a black 9mm Springfield Armory XD9 handgun loaded with one round in the chamber and fifteen rounds loaded in a sixteen-round magazine. *Id.* Mr. Richardson was arrested and charged in D.C. Superior Court Case No. 2018 CF2 001308. *Id.* On March 22, 2018, Mr. Richardson pled guilty to one count of Carrying a Pistol Without a License, and on May 18, 2018, he was sentenced to six months' incarceration suspended. *Id.*

On March 15, 2022, officers were patrolling an area known for drug trafficking and

complaints about gunshots. PSIR at ¶ 46. As officers approached a convenience store, Mr. Richardson approached them and without prompting lifted his shirt and said: "No Guns." *Id.* Officers could observe, however what appeared to be a firearm secreted underneath Mr. Richardson's pants. *Id.* Officers patted Mr. Richardson down and felt a handgun. *Id.* Officers recovered a privately manufactured 9mm "ghost" gun loaded with one round in the chamber and sixteen rounds in a twenty-four-round magazine. *Id.* The gun was also equipped with a laser sight. Mr. Richardson was arrested and charged in D.C. Superior Court Case No. 2022 CF2 001516. *Id.* On March 24, 2022, Mr. Richardson pled guilty to Carrying a Pistol Without a License and Possession of a Large Capacity Ammunition Feeding Device. *Id.* On May 24, 2022, Mr. Richardson was sentenced to fifteen months' incarceration suspended, with a year of supervised probation. *Id.* Mr. Richardson was on supervision for these offenses at the time of the instant offense. *Id.*

In addition to these convictions, Mr. Richardson has a prior conviction for Failing to Pay a Metro Fare. PSIR at ¶ 45.

## ARGUMENT

Although the Sentencing Guidelines are advisory, under *United States v. Booker*, a sentencing court "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). The Supreme Court has noted that while the Guidelines provide "the starting point and the initial benchmark" for sentencing, the district court should consider all the § 3553(a) factors. *Gall v. United States*, 552 U.S. 38, 49–50 (2007). The Guidelines' recommended sentencing range will ordinarily "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives."

11

*Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007).

The listed factors in 18 U.S.C. § 3553(a) include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>     (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>     (B) to afford adequate deterrence to criminal conduct;
>     (C) to protect the public from further crimes of the defendant; and
>     (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for –
>     (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
>         (i) issued by the Sentencing Commission . . .; and
>         (ii) that, . . . are in effect on the date the defendant is sentenced; . . .
>
> (5) any pertinent policy statement –
>     (A) issued by the Sentencing Commission . . . and
>     (B) that, . . . is in effect on the date the defendant is sentenced.
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

But the Sentencing Guidelines are only "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). They "are not the only consideration." *Id.* A sentencing judge "should . . . consider all of the § 3553(a) factors," and "[i]n so doing, . . . may not presume that the Guidelines range is reasonable." *Id.* at 50. "[I]t is not error for a district court to enter sentencing variances based on factors already taken into account by the Advisory Guidelines, in cases in which the Guidelines do not fully account for those factors, or when a district court applies

broader § 3553(a) considerations in granting the variance." *United States v. Ransom*, 756 F.3d 770, 775 (D.C. Cir. 2014) (citation and internal quotation marks omitted). In doing so, "the district court can rely on hearsay as evidence for its findings." *United States v. Miller*, 35 F.4th 807, 818 (D.C. Cir. 2022). *See also United States v. Jones*, 744 F.3d 1362, 1368 (D.C. Cir. 2014) ("Clear precedent permits hearsay to be used in sentencing decisions."). And the sentencing court can consider conduct by a defendant that was not charged or even for which a defendant was acquitted. *See United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) ("[L]ong-standing precedents of the Supreme Court and this Court establish that a sentencing judge may consider uncharged or even acquitted conduct in calculating an appropriate sentence, so long as that conduct has been proven by a preponderance of the evidence and the sentence does not exceed the statutory maximum for the crime of conviction.").

## THE APPLICABLE SENTENCING GUIDELINES

The Government calculates the applicable Guidelines as follows:

| 922(g)(1) | | |
|---|---|---|
| Base Offense Level | 20 | §2K2.1(a)(4) |
| Stolen | +2 | §2K2.1(b)(4) |
| Used in Connection with Felony (22 D.C. Code § 402) | +4 | 2K2.1(b)(6)(B) |
| AOR | -3 | §3E1.1 |
| Total | 23 | |

The Government disagrees with the PSIR in that it fails to provide Mr. Richardson with the full three-point deduction for acceptance of responsibility. Mr. Richardson timely pled guilty. While he did not do so pursuant to a plea agreement, he admitted the essential elements of the offense and has obviated the need for the Government to dedicate resources to preparing for trial.

The Government also believes that the four-point enhancement under §2K2.1(b)(6)(B) applies to Mr. Richardson' conduct. Mr. Richardson brandished a firearm at the occupants of the

13

silver Kia in a manner that reasonably would create in another person a fear of immediate injury. His actions were voluntary and on purpose. And, at the time Mr. Richardson had the apparently ability to injure those individuals because he was armed with a loaded handgun. As such, he committed the offense of Assault with a Dangerous Weapon in violation of 22 D.C. Code § 402.

Therefore, Mr. Richardson's total offense level is 23.

The Government agrees with the PSIR that Mr. Richardson's criminal history category is III. PSIR at ¶ 47. It is not clear to the Government that Failure to Pay Metro Fare constitutes a scored crime pursuant to U.S.S.G. §4A1.2(C)(1) and (2) as such an offense is akin to a minor traffic infraction. *See* PSIR at ¶ 45. Whether that conviction scores or not, however, Mr. Richardson's criminal history category remains II.

With a total offense level of 23, and a criminal history category of II, Mr. Richardson's Guideline range is fifty-one to sixty-three months' imprisonment. Additionally, that yields a Guidelines range of one to three years of supervised release and a fine of $20,000 to $200,000.

## THE GOVERNMENT'S SENTENCING RECOMMENDATION

The Government recommends that the Court sentence Mr. Richardson to fifty-one months of incarceration followed by three years of supervised release. This sentence reflects the serious nature of this offense, Mr. Richardson's continued possession of illegal firearms, and provides adequate deterrence to others in the community particularly given the dangers of carrying a modified machinegun. At the same time, the requested sentence—at the bottom of the applicable Guideline's range—acknowledges Mr. Richardson's early acceptance of responsibility in this matter as well as his difficult upbringing and struggles with substance abuse.

I.     **The Nature and Circumstances of Mr. Richardson's Offense.**

Mr. Richardson has pled guilty to a serious crime: he charged into a parking lot brandishing a machinegun, escalating a shoving match into what almost proved to be a deadly affair.

Mr. Richardson possessed this machinegun after 3:00 AM outside a busy club in the middle of downtown D.C. Following a physical altercation—one in which he did not appear to be initially involved—Mr. Richardson charged after a silver Kia as it was trying to leave the area. Mr. Richardson and others attempted to corner the Kia, while Mr. Richardson held a black handgun with an extended magazine. Even more troubling, this handgun was fitted with a conversion switch enabling it to empty its entire extended magazine with a single pull of the trigger. Given Mr. Richardson's reckless behavior with this loaded firearm it is fortuitous that only one person was injured.

Under these circumstances, the possessory nature of Mr. Richardson's crime does not mitigate the danger he presented to the community. *See United States v. Blackson*, No. 23-CR-25 (BAH), 2023 WL 1778194, at *7-8 (D.D.C. Feb. 6, 2023), *aff'd,* No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023) (the absence of evidence of "use" "does little to detract from" the danger posed by a firearm "loaded with 19 rounds of ammunition in an extended magazine, . . . more ammunition than the gun was originally manufactured to carry, thereby increasing its potential to do greater harm" and placement "at the ready, on his person, and easily within reach"). Mr. Richardson kept this firearm loaded, with an extended magazine, and a round in the chamber. *See United States v. Kent*, 496 F. Supp. 3d 500, 502 (D.D.C. 2020), *aff'd* (Nov. 5, 2020) ("[T]he firearm recovered from the Defendant's person had a round already chambered, making the

circumstances even more troubling.") And Mr. Richardson did not just keep this gun at home, in a vehicle, or even secreted on his person. Mr. Richardson held this loaded and deadly weapon in a parking garage in downtown D.C. He intentionally pulled this weapon out and used it to terrorize individuals trapped in a vehicle as that vehicle made multiple attempts to leave.

Mr. Richardson's dangerous conduct was further exacerbated by the fact that his firearm had been intentionally modified to make it even more deadly. Specifically, Mr. Richardson's firearm was equipped with a machine gun conversion device. This device allowed Mr. Richardson to fire his handgun as a machinegun. With a single squeeze of the trigger, Mr. Richardson's gun would spray twenty-two bullets almost simultaneously upon anyone who might be in range. These illegal machinegun conversion devices are particularly dangerous because they are not professionally manufactured, and these handguns are not intended to operate as machineguns. Indeed, trained ATF experts can rarely fire such guns accurately.[1] If Mr. Fleming were to pull that trigger, the gun would fire all of its bullets indiscriminately in different directions. As modified, this was no weapon of self-defense. This illegal machinegun was a deadly killing weapon.

Notably, there has been an exponential boom in machine gun conversion switches nationwide. *See* Bureau of Alcohol, Tobacco, Firearms and Explosives, 4-5 (2023) "National Firearms Commerce and Trafficking Assessment (NFCTA): Crime Guns - Volume Two," https://www.atf.gov/firearms/docs/report/nfcta-volume-ii-part-vii-recommendations/download (noting 570% increase in recovered machine gun conversion parts in 2017 to 2021 compared to

---

[1] The Government is providing to the Court contemporaneously with this filing a video demonstrating an ATF agent test-firing a firearm equipped with a machinegun conversion device.

16

2012 to 2016). Our community has not escaped this alarming trend. Indeed, the dramatic increase in machinegun conversion devices recovered in the past few years alone is frightening. Below are the estimated number of recovered machinegun conversion devices recovered in Washington D.C., according to ATF:

- 2021:   27 Machinegun Conversion Switches Recovered
- 2022:   119 Machinegun Conversion Switches Recovered
- 2023:   195 Machinegun Conversion Switches Recovered

In other words, there was an over 340% increase in recoveries of machinegun conversion devices in the District from 2021 to 2022. This alarming trend appears accelerated in 2023, with an over 622% increase in recoveries of machinegun conversion devices in the District from 2021 to 2023.

Mr. Richardson's actions were reckless and potentially deadly, justifying a significant term of incarceration.

## II.   Mr. Richardson's History and Characteristics.

The third factor, Mr. Richardson's history and characteristics, likewise merits a significant term of incarceration.

Mr. Richardson continues to acquire and possess firearms. He has been undeterred by arrest or supervision. Indeed, he was on supervision for the illegal possession of a firearm at the time that he possessed this firearm. Not only has been undeterred by previous arrests or supervision, but his conduct has only grown more extreme. In past convictions, Mr. Richardson kept his illegal firearms secreted away on his person. He now feels emboldened to openly use an illegal firearm to terrorize individuals in public.

Mr. Richardson's conduct is somewhat mitigated by his upbringing. He undeniably had

a difficult childhood which exposed him to drugs and violence. And his struggles with substance abuse are well documented. These issues undoubtedly made it more difficult for Mr. Richardson to find and maintain stable employment and avoid dangerous situations like the one he abetted in May 2023.

### III.     The Need for the Sentence Imposed.

The requested sentence is sufficient but no greater than necessary to meet the goals of sentencing. The sentence provides specific deterrence: it will keep our community safe from Mr. Richardson for a significant period of time. It provides general deterrence: it will signal to the community that the possession of machineguns in crowded public places is a deadly serious matter and hopefully deter others from similar conduct. And it provides an opportunity for Mr. Richardson to reflect on the serious and repetitive nature of his crimes.

Mr. Richardson has received lenient sentences in the past for firearm possession of suspended sentences. Those sentences have not deterred him. Despite the opportunities and second chances he has been given, Mr. Richardson continues to arm himself, but now with an increasingly deadly weapon. Further, he is now using these weapons in a brazen and dangerous fashion. Court supervision and the threat of rearrest have done nothing to deter him. He is now thirty. He no longer has the excuse of youth or impulsiveness. The requested sentence of fifty-one months is a reasonable one that secures the goals of justice.

## CONCLUSION

For all the foregoing reasons, the Government respectfully requests that the Court impose a sentence of fifty-one months followed by three years of supervised release.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:  */s/ Cameron A. Tepfer*
Cameron A. Tepfer
D.C. Bar No. 1660476
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20530
202-258-3515
Cameron.Tepfer@usdoj.gov